IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF LOVELL S.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF LOVELL S., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

MARIO S., APPELLANT.

Filed November 6, 2018.    No. A-18-326.

Appeal from the Separate Juvenile Court of Douglas County: MATTHEW R. KAHLER, Judge. Affirmed.

John J. Ekeh, of Ekeh Law Office, for appellant.

Donald W. Kleine, Douglas County Attorney, and Anthony Hernandez for appellee.

MOORE, Chief Judge, and BISHOP and ARTERBURN, Judges.

BISHOP, Judge.

Mario S. appeals from the decision of the separate juvenile court of Douglas County terminating his parental rights to his son, Lovell S. We affirm.

BACKGROUND

PROCEDURAL BACKGROUND

Mario and Kay S. are the "natural" parents of Lovell (born in 2004). The record indicates that Mario and Kay are married, but have been separated for a number of years (the record is unclear, but it appears they have been separated since at least 2009). Kay also has six other children; a seventh biological child of Kay's was adopted by another family prior to the January 2011 petition filed in this case. According to various court reports by the Nebraska Department of

Health and Human Services (DHHS), Mario was the legal father of four of Kay's six other children because he was married to Kay when they were born, but paternity tests showed he was not the biological father of three of those children; there is no indication in the record of a paternity test for the fourth child, but Kay had identified another man as that child's father. Mario's parental rights to those four other children were also terminated during these proceedings, but he does not appeal the termination of his rights to those four children. Kay's parental rights to Lovell, and five of her six other children, were terminated during these proceedings. Kay filed a notice of appeal regarding the termination of her parental rights to Lovell and her five other children, but she ultimately did not file an appellate brief. Accordingly, it is only Mario's parental rights to Lovell that are at issue in this appeal. Because Kay and the other children are not part of this appeal, they will only be discussed as necessary.

Lovell and his siblings were removed from Kay's parental care and custody in January 2011 because of concerns that one or more of the children had engaged in inappropriate sexual behavior and/or had been sexually victimized, and Kay failed to provide proper parental care, support, and/or supervision for the children. Lovell was placed in the custody of DHHS, and into a foster home. The State filed a petition alleging that Lovell was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) due to the faults or habits of Kay. In June, Lovell was adjudicated to be within the meaning of § 43-247(3)(a) based on Kay's admission to allegations in the petition.

The juvenile court appointed counsel for Mario in September 2011, "to assist [Mario] in regards to his child Lovell." In November, Mario filed a complaint to intervene in the juvenile proceedings and asked for placement of Lovell, alleging that he was the natural father of Lovell. In their answers to Mario's complaint for intervention, both Kay and Lovell's guardian ad litem (GAL) admitted that Mario was Lovell's natural father and stated that they had no objection to Mario's pending complaint for leave to intervene, but both did object to the placement of Lovell with Mario. Lovell returned to Kay's home in December.

In a February 2012 order, the juvenile court found that "Mario . . . is the father of Lovell . . . and is not a named party to this action but instead an intervenor," and the court granted Mario unsupervised visitation with Lovell as arranged by DHHS. In August, the juvenile court ordered DHHS to provide visitation between Mario and Lovell "based upon the standard Nebraska visitation terms as set forth in *Wilson v. Wilson*, 224 Neb. 589, 399 N.W.2d 802 (1987). Specifically, visitation shall include one weeknight visit per week and one overnight visit on alternating weekends."

In October 2012, the State filed a "Supplemental Petition" alleging that Lovell was a child within the meaning of § 43-247(3)(a) due to the faults or habits of Mario in that: Lovell had been subjected to inappropriate sexual contact; Lovell was undergoing therapeutic treatment for inappropriate sexual behavior; Mario allowed Lovell to be exposed to inappropriate and explicit sexual material; Mario failed to provide proper parental care, support and/or supervision for Lovell; and due to the above allegations, Lovell was at risk for harm. Apparently at some point Mario's visitation was interrupted because in January 2013, the juvenile court ordered that Mario's visitation should "resume" as previously ordered. In February, the juvenile court ordered "[t]hat on the motion of the State, this matter is dismissed as to Mario . . . only and the child Lovell."

In March 2013, Lovell was removed from Kay's home and placed into a foster home. In July, Mario filed a motion to change placement and asked that Lovell be placed with him; the motion was granted in August. Lovell was placed with Mario from August 2013 to April 2015.

On April 10, 2015, the State filed a "Fourth Supplemental Petition" alleging that Lovell was a child within the meaning of § 43-247(3)(a) (Cum. Supp. 2014) due to the faults or habits of Mario. (The second and third supplemental petitions did not relate to Mario.) The State alleged that: Mario had been uncooperative with maintaining required monthly contact with DHHS, Nebraska Families Collaborative (NFC), and the "CASA"; DHHS and NFC had been unable to verify where Mario and Lovell resided; Mario allowed unauthorized contact between Lovell and Kay; Mario failed to provide proper parental care, support, and/or supervision for Lovell; and due to the above allegations, Lovell was at risk for harm. That same day, the juvenile court ordered DHHS to take custody of Lovell for placement in foster care or other appropriate placement to exclude Mario's home; Lovell has remained in an out-of-home placement ever since.

On May 19, 2015, the State filed an "Amended Fourth Supplemental Petition and Termination of Parental Rights." The State made the same allegations regarding § 43-247(3)(a) as it had in its April pleading. The State also alleged that Mario's parental rights to Lovell should be terminated pursuant to Neb. Rev. Stat. § 43-292(2) (Reissue 2016). In June 2016, Lovell was adjudicated to be within the meaning of § 43-247(3)(a) based on Mario's admissions to the allegations that: he allowed unauthorized contact between Lovell and Kay; he failed to provide proper parental care, support, and/or supervision for Lovell; and due to the above allegations, Lovell was at risk for harm. The juvenile court ordered that Mario notify the court, all counsel in this matter, and DHHS of any change of address and phone number within 48 hours of said change.

Following a disposition hearing in August 2016 (at which Mario did not appear but was represented by counsel), the juvenile court ordered Mario to: have therapeutic visits with Lovell; undergo chemical dependency and psychological evaluations and follow all treatment recommendations including therapy; maintain safe and adequate housing and a legal source of income; submit to random urinalysis testing (UAs); and abstain from using alcohol, and not use or possess any controlled substance, except by prescription. Mario was also ordered to notify the juvenile court, all counsel in the matter, and DHHS of any change of address and phone number within 48 hours of such change.

On September 27, 2017, the State filed another motion seeking to terminate Mario's parental rights to Lovell, this time pursuant to § 43-292(1), (2), (6), (7) and (9). The State alleged that: Mario had abandoned Lovell for 6 months or more immediately prior to the filing of the petition; Mario substantially and continuously or repeatedly neglected and refused to give Lovell, or a sibling, necessary care and protection; reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the previous adjudication of the child; Lovell had been in an out-of-home placement for 15 or more of the most recent 22 months; Mario subjected Lovell to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse; and termination was in Lovell's best interests. The State further alleged that reasonable efforts under Neb Rev. Stat. § 43-283.01 (Supp. 2017) were not required because Mario had subjected Lovell to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse.

The hearing on the motion for termination of Mario's parental rights to Lovell was held over 3 days in January and February 2018. Mario was not present, but was represented by counsel who was present at the hearing. A summary of the relevant evidence follows.

Michelle Rosenberg is a family permanency specialist (FPS) supervisor, and was previously a FPS, employed by PromiseShip, formerly known as NFC. She was first assigned to this case from March to October 2014, and then again from November 2016 to May 2017. When Rosenberg was assigned to this case in March 2014, Lovell had been removed from Kay's home and had been placed with Mario. From March to October, Rosenberg met with Mario face-to-face on a monthly basis in his home; during that time, Mario was not court ordered to do anything. Services were offered to preserve the family and for financial support, including rental assistance and transportation assistance. According to Rosenberg, Mario "met Lovell's basic needs," and there were no concerns during that time.

Various DHHS court reports and case plans from September 2015 to December 2016 were received into evidence without objection. The following information is found in those reports. Lovell was removed from Mario's home and placed in agency-based foster care in April 2015, and Lovell had not had visitation with Mario since that time. (In April the State filed a "Fourth Supplemental Petition" alleging that Lovell was a child within the meaning of § 43-247(3)(a) due to the faults or habits of Mario, and in May, the State filed an "Amended Fourth Supplemental Petition and Termination of Parental Rights" seeking to terminate Mario's rights to Lovell.) Mario's whereabouts were unknown from April to July, when a FPS found an active phone number for Mario and contacted him. At a meeting with the FPS in July, Mario stated he would like visits with Lovell. The FPS said she needed to speak to Lovell's therapist and the GAL. Throughout the month of August, the FPS had several phone calls with Mario and explained to him that the GAL was not in agreement with visitation at that time, and the therapist "was not able to make a solid recommendation, due to therapy just beginning." The FPS and GAL agreed that it was not in Lovell's best interests to have visits at that time, noting that Mario's termination of parental rights hearing was scheduled for September 5. However, on September 3, the FPS found out that Mario's termination of parental rights hearing was moved to December, and was recommending (in her September 21 court report) that visitation start when recommended by Lovell's therapist. But Mario's whereabouts were again unknown from August 2015 until January 2016, when he contacted the FPS from an unknown phone number. Mario agreed to meet with the FPS in January and March; he stated he would like visits with Lovell, but also admitted he was using methamphetamine and marijuana. The FPS asked that he complete a chemical dependency evaluation, participate in random UAs and contact Lovell's therapist. Mario did not follow through with any of the above. (In June, Lovell was adjudicated to be within the meaning of § 43-247(3)(a) due to the faults or habits of Mario.) When Mario and the FPS met in June, they discussed him complying with services and court orders, but since that time he had not contacted the FPS and his whereabouts continued to be unknown as of August 2016. (The juvenile court's disposition order was entered in August.)

Rosenberg testified that when she was reassigned to the case in November 2016, she familiarized herself with what had occurred during the previous 2 years. She stated Lovell was

placed with Mario from August 2013 to April 2015. Lovell was removed from Mario in April 2015, and was placed in foster care where he remained. It was Rosenberg's understanding that Lovell was removed from Mario's home "due to lack of contact with the current FPS as well as inability to verify whether or not they had a residence, and because he was allowing contact between Lovell and his mother [Kay]"; the contact was "via a cell phone," and Rosenberg "believe[d] it was [by] text message[s]." Since the removal from Mario's home, "[Mario] had very little participation with any FPS . . . according to the documents [Rosenberg] read"; she "[did] not know exactly why [Mario] did not engage in services, but she "did see a major shift in his level of engagement."

Rosenberg testified that from November 2016 to May 2017, she was not able to contact Mario. She stated she did not have any information as to Mario's whereabouts but "had a few phone numbers and an old address of his as well as his mother's address, and [Rosenberg] would utilize those in [her] monthly efforts to contact [Mario]," but her efforts were not successful. Rosenberg also looked in local inmate records and for Mario's "particular name on social media to see if any profiles matched his name." Mario's mother told Rosenberg that she did not know where Mario was. Rosenberg also asked Lovell's mother if she knew where Mario was, but she did not have any information. During Rosenberg's time on the case from November 2016 to May 2017, Mario was court-ordered to participate in therapeutic visits with Lovell, participate in a chemical dependency evaluation and an "IDI," submit to UAs, as well as obtain and maintain safe and stable housing and a legal source of income. Rosenberg was not able to initiate any referrals for Mario for those services because she did not have his contact information. According to Rosenberg, Mario made no progress in this case and did not have any visits with Lovell. Rosenberg testified that, based on her review of the case, the time that Lovell had been in foster care, and the complete lack of care and progress made, she believed Mario's parental rights should be terminated.

Lily DeFrank is a FPS with PromiseShip. She was assigned to this case in May 2017, and was the current caseworker at the time of the termination hearing. Lovell was in foster care the entire time DeFrank was assigned to this case. DeFrank testified that when she took over the case from Rosenberg in May, she had a "staffing" with her supervisor and Rosenberg, and went through all of the documentation contained in NFocus (the State's computer system for holding information about a family, including intakes, case notes, assessments, and other documentation). Since DeFrank took over the case, she has not had any contact information for Mario; during the transfer staffing, Rosenberg let DeFrank know that she had not had contact with Mario in quite some time and she gave DeFrank the documentation in which she had made efforts to locate him or contact him. On cross-examination, DeFrank was asked what efforts she made to locate Mario at the time she was assigned the case. DeFrank responded, "I did a number of things, including searching for contact information associated with him in NFocus, searching inmate lists, searching White Pages," she also "did several social media searches as well as asked [Kay] if she had any information." But DeFrank was not able to locate Mario.

DeFrank testified that she had no contact with Mario until October 2017 in juvenile court (this was at the October 19 hearing on the first appearance and pretrial of the third motion for termination of parental rights, wherein Mario entered a denial to the allegations). During that October encounter, Mario asked if he could see Lovell, wanted to know how Lovell was doing,

and wanted to know his clothing sizes. DeFrank "gave [Mario] a brief update about how Lovell was doing," and she let Mario know that she "needed to consult legal parties and review court orders before [she] set up visitation." Also during that October encounter, Mario told DeFrank that he was staying at the Salvation Army; he did not have a phone number and said it would be better if he called her; DeFrank gave him her contact information. DeFrank asked Mario where he had been for the last 6 months and why he had not reached out to have visits with Lovell; Mario told her he had been undergoing treatment at the Salvation Army for a while, but did not specify a length of time. After seeing Mario, DeFrank did not try to set up visits because when she spoke to Lovell "just a few days" later, "Lovell had expressed to [her] that he did not want to see his father." DeFrank had also spoken to her supervisor, the GAL, and the county attorney about her decision. On cross-examination, DeFrank said that based on the information she provided to the county attorney--that Lovell stated he did not have any interest in having contact with Mario, and that Lovell had made a disclosure that he had been sexually abused by another adult when he lived in Mario's home--the county attorney told her not to allow visitation. According to a November 2017 court report authored by DeFrank which was received into evidence without objection, "In November 2017 Lovell disclosed to his foster parent and foster care specialist that he had been 'molested one time' when he resided with [Mario] 'a couple of years ago.'"

DeFrank testified that she reached out to the Salvation Army to try to get ahold of Mario. He called her in November 2017 and they had a conversation about visits. DeFrank let Mario know that she was "still consulting with legal parties and [her] supervisor because of some information that had been brought to [her] attention that [she] didn't feel comfortable sharing with him at that time and that [she] would get back to him." DeFrank talked to Mario one more time, in December; he asked about visits again, and DeFrank "told him that the court orders stated that he could not have any visitation with Lovell." DeFrank had not spoken to Mario since December. On cross-examination, DeFrank was asked, "So between the period of October of 2017 and as we sit here today in January of 2018, how many times has [Mario] reached out to you?" DeFrank responded that she recalled three times.

DeFrank said that in January 2017, the court had ordered "no more reasonable efforts" for Mario, so by the time she was assigned to the case, she was not required to offer any additional services of visitation. (That January order is not in our record.) When DeFrank reviewed Mario's service history she "saw that he had visitation set up at one point for the period of one month and he had participated in UAs for a period of one month and he had reached out to a caseworker, I think, one time and he, just, in general, had made little to no effort to be engaged in the case." DeFrank did not believe there were any additional services that could be offered to Mario in order to reunify him with Lovell. DeFrank believed that it was in Lovell's best interests that Mario's parental rights be terminated. Her opinion was "based on the history of the case. [Mario] has had a lack of engagement. When he had placement of Lovell, he allowed unsupervised contact between Lovell and [Kay]. He was given efforts for an extended period of time to engage him in the case, and he chose not to." DeFrank stated that "[i]t's in the best interest[s] of [Lovell] to have permanency."

Lovell's foster mother from January to July 2017 testified that during that time, Lovell did not have any visits with Mario, nor did Lovell receive any letters, cards, or gifts, from Mario.

In an order filed on February 27, 2018, the juvenile court found that all of the allegations in the third motion for termination of parental rights were "true in their entirety by clear and convincing evidence." The juvenile court terminated Mario's parental rights to Lovell after finding that statutory grounds for termination existed pursuant to § 43-292(1), (2), (6), (7), and (9) and that termination of parental rights was in Lovell's best interests.

Mario appeals the juvenile court's order.

## ASSIGNMENTS OF ERROR

Mario assigns that the juvenile court erred in finding (1) statutory grounds exist to terminate his parental rights under § 43-292 and (2) termination of his parental rights was in Lovell's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

## ANALYSIS

### STATUTORY GROUNDS FOR TERMINATION

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In its order terminating Mario's parental rights to Lovell, the juvenile court found that statutory grounds existed pursuant to § 43-292(1) (abandonment), § 43-292(2) (substantial and continuous or repeated neglect), § 43-292(6) (reasonable efforts failed to correct conditions leading to adjudication), § 43-292(7) (child out-of-home for 15 or more months of the most recent 22 months), and § 43-292(9) (aggravated circumstances).

Lovell had been in an out-of-home placement continuously since April 2015. At the time the "Third Motion for Termination of Parental Rights" was filed on September 27, 2017, he had been in an out-of-home placement for 29 months. At the time the termination hearing commenced on January 19, 2018, Lovell had been in an out-of-home placement for 33 months.

Our de novo review of the record clearly and convincingly shows that grounds for termination of Mario's parental rights under § 43-292(7) were proven by sufficient evidence. We therefore need not consider whether termination of Mario's parental rights was proper pursuant to § 43-292(1), (2), (6), or (9), since any one ground of the 11 identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the children. See *In re Interest of Elizabeth S., supra*.

We note that Mario asserts the juvenile court erred in finding that DHHS made reasonable efforts to assist the family in correcting the conditions that led to the adjudication. However, because we do not consider whether termination of Mario's parental rights was proper pursuant to § 43-292(6), § 43-283.01, which requires reasonable efforts to reunify families, is not applicable

to the instant case. See *In re Interest of Andrew M. et al.*, 11 Neb. App. 80, 643 N.W.2d 401 (2002). Section 43-283.01 is only incorporated into § 43-292(6), not into the remaining subsections of § 43-292. *In re Interest of Andrew M. et al., supra*.

Thus, the next inquiry is whether termination of Mario's parental rights is in Lovell's best interests.

BEST INTERESTS

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id*. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id*. The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. *In re Interest of Nicole M., supra*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's wellbeing. *Id*. The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*.

The evidence at the termination hearing was that Mario had not seen Lovell since April 2015, when Lovell was removed from Mario's home. From April 2015 until the termination hearing in January 2018, Mario's whereabouts were generally unknown to the caseworkers.

In the August 2016 disposition order, the juvenile court ordered Mario to: have therapeutic visits with Lovell; undergo chemical dependency and psychological evaluations and follow all treatment recommendations including therapy; maintain safe and adequate housing and a legal source of income; submit to random UAs; and abstain from using alcohol, and not use or possess any controlled substance, except by prescription. Mario argues "that the State did not present sufficient evidence to prove that reasonable efforts were extended to [him]." Brief for appellant at 13. However, Rosenberg testified that during her time on the case from November 2016 to May 2017, she was not able to initiate any referrals for Mario for those services because she did not have his contact information; this was despite the fact that both the June 2016 adjudication order and the August disposition order required Mario to notify the juvenile court, all counsel in the matter, and DHHS of any change of address and phone number within 48 hours of such change. And DeFrank testified that since she took over the case in May 2017 she has not had any contact information for Mario. Both Rosenberg and DeFrank testified to the many efforts they made to locate and contact Mario. Based on the evidence presented, the "lack of efforts" that Mario complains of is a result of his own failure to keep DHHS apprised of his contact information as he was court-ordered to do.

Rosenberg did not have any contact with Mario from November 2016 to May 2017. And DeFrank did not have any contact with Mario from May to October. DeFrank's first contact with Mario was at the October 19 hearing on the first appearance and pretrial of the third motion for termination of parental rights. It was then that Mario asked, for the first time in more than a year, to see Lovell. However, according to DeFrank, Mario's request for visitation was ultimately denied because "the court orders stated that he could not have any visitation with Lovell." DeFrank said that in January 2017, the court had ordered "no more reasonable efforts" for Mario, so by the time she was assigned to the case, she was not required to offer any additional services of visitation.

Both Rosenberg and DeFrank testified about Mario's lack of progress in this case. And both testified that it was in Lovell's best interests to terminate Mario's parental rights. DeFrank stated that "[i]t's in the best interest[s] of [Lovell] to have permanency."

At the time of the termination hearing, Lovell had been in an out-of-home placement for 33 months. Mario made no progress on this case. He had not seen Lovell since April 2015, had not completed chemical dependency or psychological evaluations, had not completed UAs, and had not provided information to show that he had safe and stable housing and a legal source of income. And we note that Mario did not appear at the termination hearing. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J., supra*. We find that the State has rebutted the presumption of parental fitness as to Mario. We further find that there is clear and convincing evidence that it is in Lovell's best interests to terminate Mario's parental rights.

CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Mario's parental rights to Lovell.

AFFIRMED.